UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

<u>John Collins</u>

    v.                              Civil No. 09-cv-78-LM
                                           Opinion No. 2010 DNH 177 P
<u>University of New Hampshire, et al.</u>

**O R D E R**

Plaintiff, John Collins, a tenured professor at the
University of New Hampshire ("UNH" or "the University"), filed
this civil rights action against defendants UNH, Bruce L.
Mallory, and Robert C. Whitten.[1]  The facts underlying this case
stem from an incident that occurred on the UNH campus and which
led to plaintiff's arrest on June 29, 2007, for disorderly
conduct and stalking.  Immediately after plaintiff's arrest, the
University took certain adverse actions against plaintiff
including suspending him with pay and temporarily banning him
from campus.  The criminal charges were dismissed in October
2007, and the University ultimately reinstated plaintiff to his
job in January 2008.

The two claims remaining in this case are Counts III (due
process) and IV (defamation).  Defendants have moved for summary

---

[1]The court (Muirhead, J.) previously dismissed the only counts
implicating defendant Whitten, Counts I and II.  (Doc. No. 14).

judgment on these counts.  For the reasons stated below, the
motion is granted.

## I.    Summary Judgment Standard

Summary judgment provides the means to "pierce the
boilerplate of the pleadings" and dispose of those cases or
claims where "no trialworthy issue exists." Quinn v. City of
Boston, 325 F.3d 18, 28 (1st Cir. 2003).  It is appropriate only
"if the pleadings, depositions, answers to interrogatories, and
admissions on file, together with the affidavits, if any, show
that there is no genuine issue as to any material fact and that
the moving party is entitled to a judgment as a matter of law."
Fed. R. Civ. P. 56(c).  A genuine issue is one "that properly
can be resolved only by a finder of fact because [it] may
reasonably be resolved in favor of either party." Anderson v.
Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).  A material fact
is one "that might affect the outcome of the suit." Id. at 248.

The party moving for summary judgment bears the initial
responsibility of demonstrating the absence of a genuine issue
of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317,
323 (1986).  Once the moving party has met its burden, the
burden shifts to the non-movant to "produce evidence on which a
reasonable finder of fact, under the appropriate proof burden,
could base a verdict for it; if that party cannot produce such

evidence, the motion must be granted." Ayala-Gerena v. Bristol Myers-Squibb Co., 95 F.3d 86, 94 (1st Cir. 1996) (citing Celotex, 477 U.S. at 323, and Anderson, 477 U.S. at 249). Neither conclusory allegations, improbable inferences, nor unsupported speculation are sufficient to defeat summary judgment. See Carroll v. Xerox Corp., 294 F.3d 231, 236-37 (1st Cir. 2002); see also Price v. Canadian Airlines, 429 F. Supp. 2d 459, 461 (D.N.H. 2006).

In ruling on a motion for summary judgment, the court construes the evidence in the light most favorable to the non-movant. See Navarro v. Pfizer Corp., 261 F.3d 90, 94 (1st Cir. 2001). With that precept in mind, the court sets forth the following factual recitation that includes either undisputed facts or facts taken in the light most favorable to the non-movant in this case, plaintiff John Collins.

## II.  Factual Summary

Mr. Collins joined the UNH faculty in August 1988 as an Assistant Professor. Doc. No. 24-2. In 1994, the University granted him tenure and promoted him to Associate Professor. In July 2005, the University appointed Mr. Collins to the position of Chair of the Department of Biochemistry and Molecular Biology in the College of Life Sciences and Agriculture ("COLSA"). Id.

William R. Trumble, Dean of COLSA, renewed Mr. Collins's appointment as department chair on August 7, 2006.  Doc. No. 15-2.

According to Mr. Collins, the search for a Chair of his department was a challenge for UNH because candidates for the position expressed reluctance in having to deal with a particular faculty member within the department, Ms. Stacia Sower.  Doc. No. 24-2.  Three previous chairs, according to Mr. Collins, had "encountered numerous serious problems" with Ms. Sower and had complained about the lack of support from UNH in dealing with these problems.  Id.  One candidate for chair, Richard H. Cote, withdrew his name from consideration for the position when he could not receive assurances from UNH that he would receive support in his dealings with Ms. Sower.  Id.  Mr. Cote describes his unwillingness to serve as department chair as due to the "history of conflictual interactions between Professor Sower and most every preceding chair . . . ."  Doc. No. 24-17.

Despite his awareness of the "conflictual" history between Ms. Sower and previous department chairs, Mr. Collins volunteered for the position, and the faculty elected him.  Doc. No. 24-2.  Mr. Collins's office and laboratory, as well as the offices and laboratories of the members of his department, were located on the third floor of Rudman Hall on the campus.  Id.

On April 25, 2007, one of Mr. Collins's department members
and a close colleague, Andrew P. Laudano, informed Mr. Collins
that he had been questioned by the UNH police earlier that day.
Id.  Mr. Laudano explained that he had been unloading food and
drinks for a help session with students when he realized that he
did not have his key card for the entrance to Rudman Hall and
needed to enter Rudman Hall on the other side of the building.
Ms. Sower called the police and reported that she had seen him
outside the building and felt "concerned for her safety."  The
police elected not to pursue charges against Mr. Laudano.  Doc.
No. 24-18.

Mr. Collins spoke to Dean Trumble about his "displeasure"
with the incident on Mr. Laudano's behalf.  Doc. No. 24-2.  Dean
Trumble informed Mr. Collins that he was aware of the incident.
Id.  Mr. Collins also expressed his concerns about two prior
episodes of Ms. Sower reporting to the police "frivolous"
accusations against Mr. Laudano for tampering with her
laboratory equipment.  Id.  Mr. Collins expressed to Dean
Trumble his concern that someone in his department may be
unfairly arrested someday due to Ms. Sower's frivolous
accusations.  Id.  Two days after Mr. Collins met with Dean
Trumble, Ms. Sower telephoned the police and reported that Mr.

Collins was parked illegally outside Rudman Hall.  As a result, Mr. Collins received a $100 parking ticket.  <u>Id.</u>

### A. The incident

On June 28, 2007, the incident underlying this lawsuit took place in Rudman Hall.  <u>Id.</u>  In the morning, Mr. Collins received another parking ticket for parking in the loading zone adjacent to Rudman Hall in excess of the 30 minute time-limit.  The ticket revealed that someone had telephoned the UNH police to report the parking violation.  <u>Id.</u>  Suspecting Ms. Sower, or her lab technician, Bernadine Schultz, both of whom had offices near the loading zone, Mr. Collins went to Ms. Sower's office.  At the time, Ms. Sower was serving as the Interim Associate Dean of COLSA.  <u>Id.</u>  Ms. Sower was not in her office, and Mr. Collins went to the elevator to go to his office.  <u>Id.</u>  Two individuals were waiting to enter the elevator: Ms. Schultz and Michael Fremat, a graduate student.

An exchange occurred between Mr. Collins and Ms. Schultz whereby Ms. Schultz, noticing that Mr. Collins seemed upset, was, according to Mr. Collins, encouraging him to share his feelings and "let them out."  <u>Id.</u>  She assured him he would feel better.  <u>Id.</u>  Mr. Collins responded with a tirade of epithets, which he describes as "mocking," stating "fuck her" and "I could kill the fucking bitch" loudly several times.  <u>Id.</u>  He also

kicked a large trash can in apparent anger.  Id.  Mr. Schultz
told Mr. Collins several times that she did not mean for him to
act in this manner.  Mr. Collins continued despite Ms. Shultz's
verbal suggestions that he stop.  Id.  Six people witnessed this
incident in the lobby.  Id.  Then, in the elevator on the way to
the third floor, Mr. Collins asked Ms. Schultz: "How can you
work for that fucking bitch"?  Id.  When the elevator opened to
the third floor, Mr. Collins stated sarcastically: "There, I
feel much better."  Id.

Later that same day, at around 1 p.m., Mr. Collins went to
Dean Trumble's office to discuss the incident with him.
According to Dean Trumble, Mr. Collins was calm, listened
appropriately, and acknowledged that his actions were not
appropriate for the workplace.  Mr. Collins assured Dean Trumble
that his inappropriate behavior would not be repeated.  Id.

When Ms. Sower was informed of Mr. Collins's behavior and
comments, witnesses to her response reported that she shrugged
it off, stating something to the effect of, "No big deal, oh
yeah, that's John Collins."  Doc. No. 24-4.

**B. Arrest & Banishment from Campus**

At approximately 3 p.m. that day, Ms. Schultz informed Mr.
Collins that she had reported the incident to the police.  A few
minutes later, as Mr. Collins was leaving Rudman Hall, two UNH

police officers attempted to engage Mr. Collins in a
conversation about the incident.  Mr. Collins stated that he did
not want to give a statement and ended the conversation.  Id.
At approximately 5:30 p.m., Mr. Collins returned to the campus.
Two different police officers approached Mr. Collins to inform
him that Ms. Sower was fearful of his presence.  Mr. Collins
assured them that his stay would be brief.  According to Mr.
Collins, one of the officers (whom Mr. Collins can identify by
last name) made a comment to the effect, "You're her latest
victim."  Id.

On June 28, 2007, emails were exchanged between UNH
administrators and Paul Dean, Deputy Chief of UNH Police
Department ("UPD").  Doc. No. 24-19.  These emails indicate that
University officials, including Provost Mallory and Interim
President Newman (who were copied on this email correspondence),
communicated about what criminal charges UNH would ultimately
issue against Mr. Collins.  For example, on June 28, 2007, at
5:12 p.m., Deputy Chief Dean wrote to University officials the
following email:

> He has not been arrested yet. UPD is currently
> preparing a warrant for his arrest.  The charges will
> be disorderly conduct.  There are six witnesses to
> his continued out burst [sic].  Witnesses allege he
> stated several times "I am going to kill the F**king
> bitch".

He will be asked tomorrow to turn himself in on the
warrant.

He will be asking for no contact the bail order
[sic].

Although it is not my call.  It might be in the
universities [sic] best interest to not have him in
the work place while an administrative investigation
is conducted to determine a policy violation.

Doc No. 24-19.

Later that evening, at 5:57 p.m., Kim Billings, University

Spokesperson, wrote the following email to Deputy Chief Dean:

Paul, thank you for this summary, and let me add a
couple of points since you and I had the opp to talk
on the phone a few minutes ago.  Also, I am adding
Erika Mantz to this string.  Since I am out tomorrow,
she would work with Jen on any communication issue.

The reason the charge is disorderly conduct and not
criminal threatening is because he did not use
Stacia's name.

Because the arrest will not take place until tomorrow,
it doesn't hit the police log until probably Monday.
Even if it does, it's a John Collins, not id'ed as a
professor, arrested for disorderly conduct.  Should
not raise eyebrows.  HOWEVER, there were six witnesses
to the outburst, who could conceivably talk about
this.

I just spoke to Erika and we of course will follow Jen
Murray's lead.  We see two approaches: because of
heightened awareness around violence on campus, and
because six people witnessed it, issue a short release
proactively so we are not accused later of covering
up.  Two, prepare a short release but don't
proactively release unless we get a call from a
reporter.  Probably best to wait and see how the
investigation will inform us, but those are the two
options.  The first one seems too strong at first

> blush, but again, we are just erring on the side of
> over-communicating given Va. Tech.  Again, we have
> some time to suss this out.
>
> Megan, thanks very much for letting us know about this
> so quickly.  I'm sure we'll all be on email later
> tonight. . . .

Doc. No. 24-19.

The next morning, on June 29, 2007, the UNH police arrested

Mr. Collins and charged him with stalking and disorderly

conduct.  The body of the Stalking complaint, the truth of which

was sworn to by defendant Whitten of the UNH police, charged:

> The undersigned complains that: Collins . . . at
> Rudman Hall, Durham, NH on the 28th day of June, 2007
> at 12:30 pm did commit the offense of stalking
> contrary to RSA 633:3-a . . . in that the Defendant
> did recklessly engage in a course of conduct targeted
> at Stacia Sower which would cause a reasonable person
> to fear for his or her personal safety and Stacia
> Sower was actually placed in such fear in that the
> Defendant did in the elevator of Rudman Hall and then
> twice more in the basement state that he was, "going
> to kill that fucking bitch," referring to Stacia
> Sower to multiple co-workers of Stacia Sowers [sic].
> This constituting an act of communication as defined
> under RSA 644:4 II, and was also threatening to Ms.
> Sower.

Doc. No. 18, ¶ 10.

The body of the disorderly conduct complaint, the truth of

which was sworn to by defendant Whitten, charged that Mr.

Collins:

> . . . did engage in violent, tumultuous or
> threatening behavior in a public place, in that [Mr.
> Collins] did kick over a garbage can in the lobby of

> Rudman Hall Administration Offices and screamed
> repeatedly, said actions disturbing multiple co-
> workers in the immediate area . . . .

Doc. No. 18, ¶ 11.

That same afternoon, on June 29, an officer of the
Strafford County Sheriff's Department served Mr. Collins with a
restraining order, prohibiting him from having "any contact
whether direct, indirect or through a third party by any means"
with Ms. Sower.  Id.; Doc. No. 24-6.  At approximately 3 p.m. on
that day, a UNH police officer hand-delivered a letter from UNH
to Mr. Collins.  The officer informed Mr. Collins that he had
been instructed to escort Mr. Collins off campus.  He informed
Mr. Collins that, until further notice, if he were to be seen on
campus, he would be arrested immediately.  Doc. No. 24-2.

The letter, written by J. Bonnie Newman, UNH's Interim
President, stated:

> This letter is to notify you that, effectively
> [sic] immediately, you are on administrative leave of
> absence from your duties as associate professor and
> department chair of Biochemisty and Molecular Biology
> at the University of New Hampshire.  You will continue
> to receive the salary and benefits associated with
> your position while on this administrative leave and
> will remain on leave until notified of a change in
> your status by Provost Bruce Mallory.  During your
> leave Provost Mallory will be reviewing the
> circumstances surrounding your arrest on criminal
> charges relating to behavior alleged to have occurred
> on campus, and will work with incoming President
> Huddleston to determine what, if any further response
> may be warranted.

During this leave you are prohibited from entering any property of the University System of New Hampshire, including the Durham campus, for any purpose. If during this leave of absence you have a legitimate need to enter the Durham campus you must first contact the University Police Department and receive written permission from the Chief of Police or his designee.

Doc. No. 15-4.

At 5:02 p.m. on June 29, defendant Bruce L. Mallory, UNH Provost, asked that the following email be sent to the faculty and staff at COLSA:

TO All COLSA Faculty and Staff:

Provost Mallory has asked that the press statement below be distributed with COLSA to be sure everyone has the same information.  Dr. Collins has been barred from campus by President Newman pending the University's own investigation and any subsequent sanctions.  The order will continue until the Provost notifies Dr. Collins that it is no longer in effect. Anyone who sees Dr. Collins anywhere on campus should avoid contact with him and immediately notify the UNH Police Department.

UNH PROFESSOR ARRESTED

DURHAM, N.H. -- John J. Collins associate professor and department chair of Biochemistry and Molecular Biology at the University of New Hampshire, was arrested Friday, June 29, and charged with one count each of disorderly conduct (violation) and stalking (misdemeanor).  Collins, 53, voluntarily turned himself in on a warrant that alleges he verbally threatened a colleague.

In light of the charges against Collins, the University immediately placed him on administrative

leave pending a full review of the circumstances and
determination of an appropriate response.

Collins was released on $2,500 personal recognizance
bail and ordered to have no contact with the alleged
victim or any witnesses.  He is scheduled to be
arraigned July 26, 2007, at 8:30 a.m. in Durham
District Court.

UNH Deputy Police Chief Paul Dean can be reached at
(603) 834-1393.

Doc. No. 15-5.

Other than Mr. Collins's conversation with Dean Trumble,
which Mr. Collins had initiated, no UNH official had made any
attempt to contact him prior to delivering to him the June 29,
2007, letter.  Id.  Prior to UNH's delivery of the letter to Mr.
Collins, Mr. Cote and Mr. Alberto Manalo, a COLSA Associate
Dean, attempted to intervene on Mr. Collins's behalf.  Doc. No.
24-17.  They set up a meeting with defendant Mallory, to speak
on Mr. Collins's behalf.  Id.  During the meeting, Provost
Mallory was "adament" that he had to act to protect UNH and made
reference to "events at Virginia Tech" as influencing his
decision.  Id.

On July 17, 2007, Provost Mallory wrote a "Dear Colleagues"
letter to 40 members of the COLSA faculty who had written to
Mallory regarding what they viewed as the "overly severe
response of the UNH administrators to the incident":

13

I have received your statement regarding the recent incident involving Professor Collins. First and foremost, I want to join you in asserting tha[t] any final judgments or actions "await a fuller understanding of the factors and issues that contributed to this incident." I might also say that your assertion that the administration's initial actions constituted an "overly severe response" may itself be a hasty judgment. At the time we took the actions we did, we were operating on the advice of the UNH Police Department, which was managing the incident and gathering evidence from witnesses. From their perspective, the situation literally involved a possibly life-threatening action, to which the Police were called to intervene by members of the COLSA community.

Separate from the ongoing criminal proceedings, which have produced the "public spotlight" and in which my office has played no role, I am conducting a review of the alleged events that led to the arrest. Donna Marie Sorrentino is interviewing all the parties who were present at the incident as well as those who may not have been present but who can offer corroborating information. I am personally participating in some of those interviews. We hope to complete this process in the next two weeks. Throughout our investigation, we will follow carefully the requirements of UNH policies and the Collective Bargaining Agreement. Above all, we will act in a way that assures full access to the due process protections found in policy and the CBA.

Upon the completion of Donna Marie's work, she will convey her findings to me, including recommendations for any actions that I might take in response to the incident. It is my hope that this entire process can be completed in the next four weeks. If I then were to take any action that required the due process procedures delineated in the Collective Bargaining Agreement, that would involve an additional period of time that would be hard for me to predict at this point.

14

     Our initial response and the current
investigation are grounded in two important
principles-the right to due process of anyone accused
of wrongdoing and the University's strong commitment
to maintaining a safe and civil working environment
for faculty, staff, and students. These are
complementary principles and will help guide us
through this sensitive matter.

Doc. No. 18.

### C.  Meetings between Collins and UNH

On July 20, 2007, Mr. Collins met with Provost Mallory and

Ms. Sorrentino.  Doc. No. 24-2.  Mr. Collins was accompanied by

Chris Balling, a member of the Faculty Union.  Because of the

criminal charges pending against him and on advice of counsel,

Mr. Collins declined their invitation to provide them with

information about the June 28 incident.  Mr. Collins stated that

he had not been given any reason for the ban from campus and

asked that the ban be lifted.  Id.

On August 20, 2007, Mr. Collins met for a second time with

Provost Mallory and Ms. Sorrentino.  This time, Mr. Collins was

accompanied by his counsel.  Mr. Collins provided his account of

the incident, sought an explanation for his banishment from

campus, and asked again that the ban be lifted.  Doc. No. 24-2.

Provost Mallory requested that Mr. Collins put in writing his

argument that the campus ban should be lifted.  Doc. No. 15-1.

On September 4, 2007, Mr. Collins wrote the following in a
letter to Provost Mallory:

> This letter is my response to your directive that I
> provide to you in writing the reasons you should
> resend [*sic*] the ban from campus you have imposed on
> me since June 29, 2007. Typically I would approach
> such a task by addressing your reasons for imposing
> the ban. Since I was never informed of those reasons,
> I cannot do that.
>
> Instead, I will begin by asserting that there is no
> justification, no support for your position. I reject
> it. The vast majority of COLSA faculty rejects it.
> Many of them signed a letter to you making that
> position very clear. The New Hampshire Superior Court
> rejects it as I am certain you are aware since
> I clarified that matter for you at our meeting of
> July 20, 2007.
>
> Let me also describe some of the negative impacts of
> your action for me and others. Your ban has caused
> great harm to my research. I need unrestricted access
> to my office and lab to conduct experiments and
> maintain the many strains of the organism we use in
> our research. I also need to be there on a regular
> basis to advise my graduate student, as well as
> several undergraduates who have just returned to
> campus. I also need access to my office to work on
> manuscripts and grant proposals as described in my
> letter to then Dean Trumble in late June 2007. All of
> these efforts have been at a standstill since you
> banned me from campus.
>
> With the start of the new academic year, it is also
> important for me to be back on campus to carry out my
> teaching and advising activities and to resume my
> duties as chair of Biochemistry and Molecular Biology
> and service on several other college and university
> committees.

Doc. No. 18.

On September 10, 2007, Provost Mallory concluded his investigation of the June 28 incident with the following written findings:

> Based on my review of this matter I conclude that you: (i) acted in an uncivil and unprofessional manner; (ii) violated UNH's expectations for workplace behavior; (iii) created an air of intimidation in the workplace; (iv) interfered with the university's pursuit of its educational mission; (v) exercised poor judgment; and (vii) failed to be an effective leader and role model. In arriving at these conclusions I have carefully considered your own description of your actions as something of a wise-guy's response, mocking another person's attempt to help you manage your emotions, rather than a display of genuine anger. In light of all the information I have reviewed I find your characterization of what occurred that day to be not credible and conclude instead that you lost control of your emotions and acted in a threatening and intimidating manner, thereby causing harm to members of the UNH community.

Doc. No. 15-8.

Provost Mallory imposed the following sanctions: (1) terminated Mr. Collins' appointment as department chair; (2) reprimanded Mr. Collins and warned him about future misconduct; (3) required him to complete an anger management program; and (4) required him to write a letter of apology to Ms. Sower. Id. Provost Mallory extended Mr. Collins's ban from campus until "such time as the criminal and civil sanctions" against him "are concluded" and he had "satisfied the terms of the sanctions . . . ." Id.

### D.   UNH Lifts Suspension and Ban

On October 23, 2007, after testimony from witnesses called by both the prosecution and defense, the court dismissed the charges against Mr. Collins.  On November 7, 2007, the civil action brought by Ms. Sower in Strafford County Superior Court concluded with an order vacating the "no contact" order and, in its place, ordered that Mr. Collins "shall not harass, threaten, intimidate, or interfere" with Ms. Sower's liberty.  Doc. No. 18.

On January 15, 2008, Mr. Collins received a letter from Provost Mallory informing him that he had complied with the sanctions and his administrative leave and campus ban would end on January 22, 2008.  Doc. No. 24-2.

### III. Discussion

In Count III, plaintiff alleges that the adverse actions the University took against him after his arrest on June 29, 2007, violated his rights to due process under the federal Constitution.  In Count IV, plaintiff asserts a state law claim of defamation against the University for published statements the University made about him on the date of his arrest.  These counts are discussed separately below.

## A. Count III (Due Process)

Plaintiff challenges as insufficient under the Fourteenth Amendment Due Process Clause[2] the process the University afforded him, or failed to afford him, when it suspended him with pay from his professor and department chair positions, temporarily banned him from being on campus, and, ultimately, permanently stripped him of his position as department chair.

It is well-established that "[p]rocedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property.'" Mathews v. Eldridge, 424 U.S. 319, 332 (1976). As the Supreme Court has emphasized, "before an individual is finally deprived of a property interest," the governmental actor must provide "some form of hearing." Id. at 333. Likewise, it is without dispute that a public employee who is a tenured professor enjoys a property interest sufficient to invoke procedural due process protections. E.g., Cotnoir v. Univ. of Me. Sys., 35 F.3d 6, 10 (1st Cir. 1994).

---

[2]Defendants make a technical argument that summary judgment should be entered in their favor on Count III because that count references the Due Process Clause of the Fifth (rather than the Fourteenth) Amendment to the United States Constitution. See Doc. No. 16-1, ¶ 43. Despite the technical error in Count III, this court reads that count as alleging a violation of the Fourteenth Amendment's Due Process Clause. See Fed. R. Civ. P. 8(a).

Once a plaintiff establishes the deprivation of a liberty or property interest, "the question remains what process is due." FDIC v. Mallen, 486 U.S. 230, 240 (1988) (internal quotation marks omitted). The "identification of the specific dictates of due process" requires that the court consider "three distinct factors":

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

Mathews, 424 U.S. at 335.

Plaintiff contends that the University was required to provide him with notice and hearing prior to the suspensions with pay and the campus ban. Plaintiff also contends that the post-deprivation process that he received was insufficient.

This court first addresses whether the suspensions with pay and the campus ban worked a deprivation of liberty or property interests such that plaintiff was entitled to pre-deprivation process.

### 1. Suspensions With Pay

There is no factual dispute that defendants suspended plaintiff from his positions as professor and department chair

20

pending further investigation of the June 28 incident.  Doc. No. 15-4 (referring to the suspension as "administrative leave"). During the suspension, plaintiff was paid his full salary and received all his benefits.  Id.  Following its investigation, the University lifted the suspension relating to plaintiff's position as tenured professor in January 2008 but removed him from the department chair position on a permanent basis.  Id.

The threshold question here is whether the University's suspension of plaintiff with pay deprived plaintiff of a property interest such that he was entitled to a hearing in advance of the suspension.  The Supreme Court has noted that it is an open question "whether the protections of the Due Process Clause extend to discipline of tenured public employees short of termination."  Gilbert v. Homar, 520 U.S. 924, 929 (1997) (emphasis added).  Where a public employee is suspended with pay, the First Circuit has held that the employee is not entitled to pre-suspension process.  Torres-Rosado v. Rotger-Sabat, 335 F.3d 1, 9-10 (1st Cir. 2003).

As the court in Torres-Rosado explained, "a government employer who wishes to remove a worker immediately may suspend that worker with pay until the procedures associated with termination can be completed."  Id. at 9.  The court explained that a suspension with pay is not a deprivation of such serious

magnitude as to require a pre-deprivation hearing: "Plaintiff's paid suspension in this case, which caused only a very temporary deprivation of job functions and no financial loss, did not give rise to any constitutional entitlement to due process." Id. at 10. See also Jones v. Town of Milo, 2009 WL 1605409, *7 (D.Me. 2009) ("The Court should dismiss this theory of liability because placement on paid administrative leave is not a deprivation that requires any predeprivation process." (citing Torres-Rosado, 335 F.3d at 9)).

Accordingly, the court grants summary judgment in favor of the defendants on plaintiff's claim that the University deprived him of due process when it failed to provide pre-suspension notice and hearing.

### 2.  The Campus Ban

The court finds undisputed the facts concerning the details of the campus ban.  As noted, the campus ban was temporary and was lifted by the University after its investigation.  Moreover, by its own terms, the ban was not absolute, but was subject to exceptions. Specifically, the ban allowed plaintiff, in the event he had a "legitimate need to enter the Durham campus," to "contact the University Police Department and receive written permission from the Chief of Police or his designee" to enter

the campus.  Doc. No. 15-4.  The record contains undisputed evidence that the exception was utilized by Mr. Collins on multiple occasions during the pendency of the ban.  See Doc. No. 15-10.

Plaintiff argues that the ban deprived him of liberty interests, such that he was entitled to pre-deprivation notice and opportunity to be heard.  Specifically, plaintiff claims he had interests in being on campus that extended beyond those held by members of the general public.  Plaintiff says (1) he "had ongoing research at his lab on campus," such that the ban interfered with "pursui[t] of his career" and (2) he had a liberty interest in "attending his children's sporting events" which sometimes took place on campus.  Defendants counter, relying on cases where courts have held that members of the general public have no liberty interest in being present on a university campus.  See Holbach v. Jenkins, 2009 WL 2382756, at *6 (D.N.D. 2009); Moore v. Ricotta, 2002 WL 398205, at *1; Souders v. Lucero, 196 F.3d 1040, 1046 (9th Cir. 1999). According to the defendants, the suspensions with pay stripped plaintiff of his status as professor and department chair, thus rendering him nothing more than "a public citizen."  The court rejects defendants' argument but holds for other reasons that

the campus ban in the present case did not deprive plaintiff of
a liberty interest.

First, the logic of defendants' argument is flawed.  First
Circuit precedent deems a suspension with pay as an event not
constituting a deprivation of property precisely because a
suspension with pay is not sufficiently serious.  Torres-Rosado,
335 F.3d at 10 (holding no deprivation of property interest
because the suspension with pay "caused only a very temporary
deprivation of job functions and no financial loss").
Defendants correctly rely on that legal proposition in asserting
that they owed plaintiff no process prior to their suspension of
plaintiff.  Inconsistently, however, they assert for purposes of
the campus ban that the suspension worked a complete erasure of
plaintiff's status as professor and department chair such that
he became nothing more than an ordinary citizen.  Defendants
cannot have it both ways.

Nevertheless, even though the suspension with pay did not
render plaintiff an ordinary citizen,[3] the campus ban, as
designed and applied in the present case, did not work a
sufficiently serious harm to plaintiff to rise to the level of

---

[3]With respect to plaintiff's interest in viewing his children's
sporting events on campus, he is in the same position as a
member of the general public.  This is not an interest that
distinguishes plaintiff from an ordinary citizen, and so, does
not rise to the level of a protectable liberty interest.

the deprivation of a liberty interest.  Plaintiff's interest in
"tending to his campus laboratory [and] mentoring his graduate
students" is not an interest independent of the job from which
he was temporarily suspended with pay.  In other words,
plaintiff's alleged liberty interest in continuing his research
and supervising his students is indistinguishable from his
interest in his job.  Torres-Rosado, 353 F.3d at 10, holds that
a temporary suspension with pay does not rise to the level of
deprivation of a property interest sufficient to require pre-
deprivation process.  To the extent plaintiff's claimed liberty
interest is coextensive with his claimed property interest, it
is, for the same reasons, insufficient to entitle him to pre-
suspension process.

As the non-moving party, the plaintiff has the burden to
show a material factual dispute that his research interests are
not simply incidental to his job as professor.  He has not made
this showing.  In addition, even if he had, given the contours
of the campus ban in this particular case, plaintiff cannot
show, as a matter of law, that the ban here worked a
sufficiently serious impingement on any such independent
interest.

Because a tenured university professor is in a different
position vis-a-vis the university campus than is a member of the

25

public given a professor's host of social and economic ties to persons and facilities on campus, there may be circumstances under which a tenured professor could be deprived of a liberty interest by operation of a campus ban.  The campus ban in the present case, however, did not rise to that level.  The undisputed facts show that the ban was both temporary and subject to exceptions for plaintiff's "legitimate needs."  See Doc. No. 15-10 (examples in the record of the University granting plaintiff permission to be on campus during the pendency of the ban).

Mindful that plaintiff undoubtedly suffered embarrassment and inconvenience as a result of the ban, this court cannot say, as a matter of law, that the plaintiff suffered an injury of constitutional dimension.  In short, the temporary, conditional campus ban in this case, like the suspension from his job with pay, is insufficiently serious to require pre-deprivation process.  See Torres-Rosado, 335 F.3d at 9.

Even if the campus ban worked a deprivation of a property or liberty interest, plaintiff would have to overcome the presumption that the arrest of plaintiff on criminal charges, which followed a judicial determination that there was probable cause for such arrest, justified prompt action by the University suspending plaintiff and banning him from campus prior to any

notice or hearing.  See Gilbert, 520 U.S. at 934 (upholding university's decision to suspend employee without providing him notice and opportunity to be heard on basis of his arrest on criminal charge); Mallen, 486 U.S. at 240 (holding that felony indictment of bank president provides a "substantial assurance that the deprivation is not baseless or unwarranted," and given important government interest in the integrity of banks that would be threatened without prompt suspension, FDIC may take "prompt action" and "postpon[e] . . . the opportunities to be heard until after the initial deprivation").

Accordingly, this court holds that, as a matter of law, the University was not required to provide plaintiff with notice and opportunity to be heard prior to imposition of the campus ban.

### 3.  Permanent Removal From Position as Department Chair

The facts are undisputed that the plaintiff's suspension with pay from his positions as professor and department chair and the campus ban were initially all temporary, pending the University's investigation and decision-making.  The suspension with pay as professor and the campus ban never became permanent, since the University eventually terminated those actions.  In contrast, the University did in the end convert the department

chair suspension to a permanent removal of plaintiff from that position.

Assuming, without deciding, that the permanent removal of plaintiff's title as department chair constituted a deprivation of a property interest sufficient to invoke due process protection, "the question remains what process is due." Mallen, 486 U.S. at 240.  In this case, the court has already found that the suspensions with pay and the campus ban did not deprive plaintiff of a liberty or property interest such that the University was required to provide plaintiff with process prior to taking those actions.  What minimum notice and opportunity to be heard defendants may have owed plaintiff after imposition of those actions this court need not decide; the court finds as a matter of law that defendants provided plaintiff with enough process to meet even the eventual permanent deprivation of plaintiff's property interest in the department chair position.

The undisputed facts in this case show that, on July 20, 2007, during the pendency of the University's investigation of the incident, the University provided plaintiff with an opportunity to be heard.  At the meeting, plaintiff met with Provost Mallory and Ms. Sorrentino.  Plaintiff was accompanied by a member of the Faculty Union.  Doc. No. 24-2.  On August 20, 2007, the University provided plaintiff with a further

opportunity to be heard.  At the second meeting, plaintiff was accompanied by his counsel.  After that meeting, and at the suggestion of Provost Mallory, plaintiff put into writing his argument that the ban should be lifted.  Id.  Thus, within 60 days of plaintiff's initial suspension, the University had given plaintiff two opportunities to present his version of events.[4]

On September 4, 2007, plaintiff submitted his written statement to the University, and less than one week later, on September 10, Provost Mallory concluded his investigation of the matter and, along with certain other sanctions, terminated plaintiff's appointment as department chair.  Doc. Nos. 15-8, 18.  Provost Mallory's September 10 letter informed plaintiff that he would be permitted back on campus after the criminal proceedings were concluded and plaintiff had satisfied the terms of the September 10 letter.  Doc. No. 15-8.  On January 22, 2008, the University reinstated plaintiff to his teaching position and lifted the campus ban.  Doc. No. 24-2.

---

[4]Plaintiff makes the claim in this case that the University gave him no notice of the reasons for the campus ban.  Plaintiff claim is belied by the undisputed facts in the record that make clear that he was well aware that the University's decision to suspend him and prohibit him from being on campus was a direct result of the incident on June 28, 2007, which led, the day after, to his arrest on criminal charges.  There was no unfair surprise to plaintiff or his counsel.

The post-deprivation process that plaintiff received was
more than sufficient to satisfy the Due Process Clause.  Prior
to making any factual findings with respect to plaintiff's
employment status, the University gave plaintiff notice and
multiple opportunities to be heard.  In the end, plaintiff was
not terminated.  The only permanent deprivation plaintiff
suffered was the loss of his department chair position.  The
University gave plaintiff ample process before taking that
adverse action against him.[5]  The University is entitled to
summary judgment on plaintiff's due process claim.

### B.  Count IV (Defamation)

Plaintiff alleges that two written statements by UNH are
false and defamatory.  The first is contained in the press release
which the University issued after plaintiff's arrest and which it
attached to an email it sent to the faculty and staff of COLSA.
That statement is: "In light of the charges against Collins, the
University immediately placed him on administrative leave pending

---

[5]In dicta, the Torres-Rosado court stated that "it is
conceivable that a very long or open-ended paid suspension might
function so much like a termination that some due process
protection might attach."  Torres-Rosado, 335 F.3d at 10 n.8.
To the extent plaintiff's suspension with pay was "very long"
and seemed "like a termination," plaintiff was nonetheless, for
the reasons explained above, afforded sufficient process during
the course of the suspension to satisfy the requirements of the
Due Process Clause.

a full review of the circumstances and determination of an appropriate response. . . . UNH Deputy Chief Paul Dean can be reached at (603) 834-1393." (Hereinafter referred to as "statement 1").

The second statement is a portion of the University's email to COLSA faculty and staff. That statement is: "Anyone who sees Dr. Collins anywhere on campus should avoid contact with him and immediately notify the UNH Police Department." (Hereinafter referred to as "statement 2").

In New Hampshire, defamation requires proof that a defendant "failed to exercise reasonable care in publishing, without a valid privilege, a false and defamatory statement of fact about the plaintiff to a third party." Indep. Mech. Contractors v. Gordon T. Burke & Sons, 138 N.H. 110, 118, 635 A.2d 487, 492 (1993) (citing Restatement [Second] of Torts § 558 (1997)). "A statement is not actionable if it is substantially true." Simpkins v. Snow, 139 N.H. 735, 770, 661 A.2d 772, 776 (1995).

To determine whether a statement is defamatory, a court must read the statement "in the context of the publication taken as a whole." Duchesnaye v. Munro Enters., 125 N.H. 244, 249, 480 A.2d 123, 125 (1984) (internal quotations omitted). "In such context, a statement in the form of an opinion may be read

31

to imply defamatory facts, and it is actionable if it is actually understood that way."  Id.

New Hampshire recognizes a qualified or conditional privilege for otherwise defamatory statements.  Id.  A qualified privilege exists "'if the facts, although untrue, were published on a lawful occasion, in good faith, for a justifiable purpose, and with a belief, founded on reasonable grounds of its truth,' provided that the statements are not made with actual malice." Simpkins, 139 N.H. at 740, 661 A.2d at 776-77 (citation omitted).  The burden is on defendant to show the existence of a conditional privilege, but plaintiff has the burden of showing that defendant acted with malice.  Duchesnaye, 125 N.H. at 253, 480 A.2d at 128.

The University moves for summary judgment on the basis that the statements were true, and, in any event, the University was privileged to make the statements.  The court analyzes the statements separately below.

### 1. Statement 1

Statement 1 is a factual recitation containing the following assertions:  (1) because of plaintiff's criminal charges, the University placed plaintiff on administrative leave; (2) plaintiff would be on leave pending review of the circumstances and a decision being made as to an appropriate

response.  Statement 1 also includes the phone number for the
UNH Deputy Chief of Police.

Read in the context of the press release, statement 1 is
entirely true.  There are no material factual disputes in this
record that could possibly lead to an inference that anything
contained in statement 1 is false.  The University is entitled
to summary judgment on this claim.

### 2.  Statement 2

Statement 2 was not part of the press release.  It was
included in the e-mail from the University to its COLSA faculty,
along with the press release.  Statement 2 is not a statement of
fact.  Rather, it is an instruction to the COLSA faculty that,
in the event they should see plaintiff on campus during the
pendency of the campus ban, they "should avoid contact with him
and immediately notify the UNH Police Department."

Plaintiff argues that, read in context, statement 2 implies
that plaintiff was "armed and dangerous."  The court disagrees.
Statement 2 implies that plaintiff may violate the campus ban by
appearing on campus during its pendency, and, construed in
plaintiff's favor, it could be read to imply that plaintiff was
"dangerous."  However, no one could reasonably read statement 2

as implying that plaintiff was "armed."[6]

While it may be a fair inference from statement 2 that plaintiff was, at that time, considered "dangerous," such an inference on this undisputed record, could not reasonably be construed as false.  By plaintiff's own admission, during the June 28 incident, he loudly stated several times to a female colleague of Ms. Sower that he "could kill the fucking bitch." Doc. No. 24-2.  Plaintiff admits that, during the incident, he kicked a trash can.  Id.  It is also undisputed that, prior to its release of statement 2, the University was aware that its police department had arrested plaintiff on criminal charges related to the incident.  To the extent statement 2 implied that plaintiff was dangerous, such an implication would be redundant and incidental to the truthful announcement, contained in the accompanying press release, that plaintiff had been arrested on

---

[6]When asked at oral argument what evidence plaintiff had to prove that a person who actually read statement 2 construed it as suggesting that plaintiff was "armed and dangerous," plaintiff's counsel asserted that the defamatory nature of statement 2 is self-proving (i.e., that any person who read statement 2 would understand it as implying that plaintiff was "armed and dangerous").  Because plaintiff is arguing defamation by implication, he is required to provide testimony from actual witness(es) who read the statement and understood it to contain that implication.  See Duchesnaye, 125 N.H. at 249, 480 A.2d at 125 (where alleged defamation arises from a statement's implication, it is actionable "if it is actually understood that way").  Plaintiff has not cited to any such witness testimony in his written submissions, nor did he point to any such evidence at oral argument.

charges of disorderly conduct and stalking.  Read in the context
of the entire publication, statement 2 was substantially true.
Statement 2 is not, therefore, actionable as defamation under
New Hampshire law.[7]  See Simpkins, 139 N.H. at 740, 661 A.2d at
776.

Even if statement 2 could be construed as false and
defamatory, the University would be entitled to summary judgment
on the question of privilege.  See Caouette v. OfficeMax, Inc.,
352 F. Supp.2d 134, 144 (D.N.H. 2005) (noting that issue of
whether defendant was privileged to make statement can be
decided at summary judgment).  The University communicated to
its COLSA faculty the fact of plaintiff's arrest and the
issuance of the campus ban.  Statement 2 was issued as part of
that communication.  The University's decision to include an
instruction that COLSA faculty contact the police if they saw
plaintiff on campus during the pendency of the campus ban was,
on the undisputed facts in this record, lawful and reasonable
under the circumstances.  While there is evidence in the record
that suggests that Ms. Sower acted with malice toward plaintiff,

---

[7]Construed in his favor, Mr. Collins's tirade on June 28 was
intended to "mock" Ms. Schultz's request that he "share" his
anger.  Mr. Collins's state of mind while he was yelling
epithets and kicking a trash can is not legally relevant on the
question of whether there are factual disputes sufficient to
send the defamation question to the jury.

there is no evidence in the record that Ms. Sower was involved in the University's decision to issue statement 2, nor is there evidence that the University otherwise acted with malice in issuing statement 2.  The University is entitled to summary judgment on Count IV.

Accordingly, the court grants defendants' motion for summary judgment on Counts III and IV (Doc. No. 15).  The pending motions in limine (Doc. Nos. 29, 33, and 34) are denied as moot.  The clerk shall enter judgment in accordance with this order and close the case.

SO ORDERED.

_____
Landya B. McCafferty
United States Magistrate Judge

Dated:  October 8, 2010

cc:  John L. Arnold, II, Esq.
     Paul McEchern, Esq.
     Martha Vann Oot, Esq.